The next case on the calendar for today is number 2010 76 Menora Mivtachim Insurance versus Yehudai et al. Mr Lieberman. Good morning, your honors, Jeremy Lieberman from Pomerantz LLP on behalf of appellants. I'd like to reserve three minutes for a bottle. Your honors, with respect to the district court's ruling, we respectfully submit that the court committed reversible error by dismissing the complaint with prejudice. The court dismissed on grounds of standing and also on the threshold issues regarding materiality and falsity. With respect to standing, we believe the court did not properly look at the claims and properly analyze the claims. The cases in the Supreme Court have all analyzed standing and said that section 10B should be read broadly. Is that right, counselor? That's not how I read blue chip. I, in fact, read it as a guidance to appellate courts to not open the floodgates, if you could respond to that. Well, I mean, it's everything is factually determinate. So, so you have affiliated you discussing how there should be broad that should be read, should be read broadly the statutory scope. Blue chips was a case talking about how a purchaser, someone who did not brought a claim because they did not purchase securities based upon alleged misstatements made by an issuer. So as I say, it was a case where anyone could claim I didn't buy a stock because the company made false statements. That was too remote of a claim. And two, it was too elusive to substantiate a claim for securities fraud. Right. So we know that Nortel wasn't enough right in this circuit. If you could explain with some particularity why you think you are more rigorous than the facts that happened in Nortel. Well, for the facts, for what was discussed in Nortel, Nortel specifically discussed ascendant case and said that in a merger scenario. But that's a third circuit case that they didn't find anything. Can you can you focus on on Nortel, please? Sure. Nortel was a scenario where there is a business relationship, a business relationship only between Nortel and J.D.S. Uniface. And the business relationship was deemed to be too remote. That's false statements made by Nortel regarding its prospects. I'm aware of Nortel. I'm sorry if I'm not being clear. I'm asking you to explain how you are more related than what they found in Nortel. Oh, sure. Because in our situation, it's a merger scenario. Fruteram is becoming is it was a company that was was was going to be fully merged and acquired by IFF. That is a direct relationship. That's a direct and substantial relationship that's required by Nortel. So you are asking us to rule that in a merger context, that is per se proof of a close enough connection. Well, I certainly certainly there is no byline rule against the merger scenario, i.e. if you can make allegations that when there's a merger scenario, that the impact of the merger is going to have a significant impact on the share price of the acquiring stock. Then you do it. Then you would have. Isn't that conflating the idea of the business relationship with the statements? Right. Aren't what we need to establish that the statements that were made impact the stock more than what they did in Nortel, not what the relationship looks like. Well, Nortel analyzed and whether the relationship was direct and substantial. Those are the two issues. And it was too remote in Nortel. And so in contrast to those facts here, we have clearly not remote. This is this is a merger situation. It's a quiet, quiet, fully food and clearly substantial. All the analysts said at the time that the fate of IFF is going to be dependent upon the success of food. So you have both. You have both the direct relationship and your substantial to have a bright line. Your test would be that it has to be both a merger and it has to be substantial enough to affect the stock price. Either one of those by itself is enough. I would say I would say clearly when both are present, like we have here, it's enough. Maybe if it's a merger of a company that clearly is not material to the acquiring company, maybe that would be too substantial enough. But there is remote that there is direct and substantial. That's the standard articulated by Nortel. Nortel specifically said we don't express opinion on the merger scenario. What if what if the merger had fallen through at the 11th hour so they never actually merged, then then would there be standing? Well, if the merger fell through as a result of misstatements made by Fruiteram. No, just for other reasons. Let's take that out of the equation. I think it's hard for me to speculate under the facts of this case. Clearly, the direct relationship might fall apart then because you don't know you no longer have a relationship saying where the revenues earned by Fruiteram projections clearly are part of the projections of IFF. That's what we have here. I have actually took his projections and and made them based upon the statements made by Fruiteram. And so that's the question to take Judge Park's hypothetical. If the statements that are claimed to be actionable predate the merger. Why would it be relevant whether the merger went forward or not under your theory, assuming that the statements had the same effect on whatever, boosting the merger partners price and then letting it collapse at some future point? Why would the success or failure of the merger be relevant? Oh, I don't know that it would be. I think it would be a fact that a specific situation and send in. It was a failed merger that the court allowed. That is, if it's the same analysis, then why does the fact of a merger matter and why would it not be under? Isn't your theory the same as the one that's been rejected, which is that, well, you know, if you make a statement and you're not part of the issuer, but you make a statement and it has some effect on a third party and another company. You know, under your theory, you're saying there should be 10 B5 liability, but we know we know from the Supreme Court that's not true. Because Nortel and even blue chip says at some point the relationship is too remote. At some point, you can't go too far. But there are certain scenarios where the relationship is substantial and is direct. That is sufficient. And that is clearly the case here, where it's a merger with where the fortunes of Fruiterum clearly are going to determine the fortunes of IFF. And to say you have a scenario where a company could the law that defendants want to propagate here that you can simply if you're a merging company, you can make all the false statements regarding your success. And that's the only the only stock purchaser that's going to be related to Fruiterum after the merger is IFF. And somehow you get a blank check when it comes to liability. But doesn't that sort of seem to require some sort of an ex post analysis of the relationship that eventually came to be? Whereas I would have thought that the liability would arise at the time that statements were made, regardless of how things play out in the future. Maybe maybe, you know, damages and everything are affected by how things play out in the future, how far the stock price falls or something. We would say the analysis is when you have a given that it's a merger and given the merger as a material to the company, that on its own would be substantial and direct relationship. And so clearly, the merger is consummated makes the relationship even more direct. And so there is there is no way when you're looking at blue chips, blue chips tells you at some point you have to cut the liability can can extend to all parties all in the universe. At some point, it's got to be direct and it's got to be substantial and or tell analyze that said a business relationship. That's not enough. Well, there are a lot of business relationships out there. But a merger situation, that's something that it's a different scenario might require a different result. We express no opposition and we leave that for another day. That day is now. And the question is, is that a are we going to diverge from third circuit in in sentence? And in this case, you would say that basically it would be a it would be a free pass for any merge entity. They can prop up their financials. And at some point, they're not going to have anyone trading their shares anymore. That's what happens in a merge company. Right. And they can then lie to their acquiring company. And that lie could come out and could be that the company that you bought and purchased has no value whatsoever. And you can say tough luck, shareholders. You've been defrauded. Well, you weren't the company that actually issued the shares. You have no actual recompense. And that's that's the rule the defendants are asking this court to take on. And we think that's simply not what the purposes of the securities laws are. Clearly, we make the direct and substantial test or tell has given the guidelines. Would the acquiring company be able to sue the former officials of of the acquired company who lied to them? Well, they are. They are suing for 20 million dollars. I mean, they are suing you. I mean, you just said I thought your suggestion was that a company that is being acquired in a merger has a blank check to lie and never be exposed. To securities fraud liability, that may be the case, perhaps with respect to the shareholders of the acquiring company. But would that necessarily also be true of the acquiring company itself? Who one might imagine and maybe not would be expected to act in the fiduciary interests of its shareholders and to pursue such a security fraud case itself against, I assume, the people who told the lies, the former officers perhaps of of the acquired company. Is that on the table? Is that a possibility or in your view, is that foreclosed? I could be wrong. They could bring an action against the former directors. They are certainly not going to bring an action against the company itself. They own the company. And so therefore, the company itself that lies to the shareholders of IFA makes those lies. There is there is there a free pass. And that's the issue. And clearly, clearly, Nortel said hesitated to make that jump. Clearly, Senden hesitates to make that jump. I would urge this court not to make that jump because that's a whole category of cases, a whole category of frauds that are occurring. Now you have SPACs and you have other scenarios where there are companies that are trying to prop themselves up and prop up their fortunes, hoping to get grabbed by an acquirer. And if you turn around, if we turn around and say, well, you can be acquired. And as long as you're acquired, the company that makes the company that makes those misrepresentations doesn't get a free pass. That is a very poor precedent, we think, for this most important jurisdiction in the United States. Thank you, Mr. Lieberman. We'll hear from the police. I have Mr. Cooper and Mr. Vano. You guys, I whoever is slated to go first may proceed. Yes. Good morning, Your Honors. May it please the court. My name is Roger Cooper from Cleary Gottlieb on behalf of defendant Apali Frutiram Industries. The dismissal of this case should be affirmed on numerous grounds. Now, I'm going to address plaintiff's failure to plead fraud. And Mr. Vano, we divided up the argument and Mr. Vano will address plaintiff's lack of standing and the issues you've just been discussing and their failure to plead any violation of law. But at the outset, I would like just to remind the court of how truly unusual this case is. IFF, the U.S. issuer here whose stock the plaintiffs purchased, is no longer in the case. What remains are Israeli investors in IFF, the U.S. company, suing Frutiram, an Israeli company, under the U.S. securities laws for what Frutiram allegedly did in Russia and Ukraine many years ago. The Israeli plaintiffs did not invest in Frutiram. Frutiram never listed or traded securities in the U.S. And all the challenge statements about are about Frutiram. They're not about IFF. And they were never directed at IFF investors. And then on top of that, there's two. Just to clarify, are the disputed statements that you're talking about by Frutiram statements that predated the merger? All of the statements, Your Honor, predated the merger. So the statements that are challenged all took place between May 7th of 2018, the date that the transaction was signed and announced, and August of 2018. So actually a good bit before the transaction closed in October. So at a time when Frutiram was not wholly owned by IFF or indirectly by the shareholders. That is correct, Your Honor. That's right. Now, turning to plaintiff's failure to plead fraud, the complaint fails for multiple reasons. First, plaintiffs haven't pleaded facts showing that the defendants were engaged in making unlawful customer payments during the relevant time period. And even if they pleaded those underlying facts, they have not identified any actionable misstatements or omissions that they can proceed on. They also haven't pleaded materiality. And we also briefed the issue. This court could separately affirm for lack of personal jurisdiction. Now, just briefly on the first argument, plaintiff's failure to plead with particularity that any improper payments occurred after 2014. Their only source for their pleadings comes from two confidential witnesses, but they both left Frutiram by the end of 2014. They had no firsthand knowledge after that of anything that happened at the company. Plaintiffs assert, well, the payments must have continued, but that's just speculation. It must be shown. They have two allegations where they try to fill this gap. These are paragraphs 82 and 83 of the complaint. And one involves the former CFO of Frutiram, Russia, who allegedly, quote, confirmed to Confidential Witness 1 that the bribery continued through 2018. The other is a statement Confidential Witness 1 claims that he heard from customers who said that everything continued as usual into 2018. Counselor, if I may, I think their strongest argument is the fact that statements about historical financial performance and sources of organic growth were actionable because they omitted that bribery up to 2014 contributed to performance and growth. Can you actually focus on that, please? Yeah, Your Honor. So first, those statements about growth only cover the time period from 2015 to now. Absolutely, but I think the strongest version of their argument is that those statements for past historical preference contributed to the growth that we have now that people were relying on. So if you could focus on what that means for us and materiality, whether or not we need to figure out whether or not those statements actually had a material impact on the stock prices. Absolutely. So, well, first, they haven't actually pleaded facts showing that any improper payments were occurring during those time periods that are covered by those statements about organic growth. So they have to plead the underlying predicate facts. They haven't done it for that period because the period that is covered by those statements is after 2014. But secondly, I'm so sorry if I'm not being clear. I think the argument is that fraud that happened pre-2014 contributed to the historical package of the performance and growth that they have. And therefore, they do not need to, or they still have something that's potentially there for activities that happened after 2014 because the statements about historical performance neglected to include what was created as a result of the bribery. You and I are not having an argument about whether or not they adequately pled anything after 2014. I'm trying to figure out the materiality or whether or not there's enough there for us to decide that we don't need to be worried about these historical performances. Right. Understood, Your Honor. Well, setting aside the first argument I made, I think if you just focus on the statements, one, they're too general to be actionable here. They focus on sales growth, but they don't mention emerging markets. They don't mention Ukraine. They don't mention Russia specifically. In 2017, for example, Fruitera marketed and sold its products in over 150 countries. So the district court properly concluded that the kinds of statements that they were making about growth were too general. But secondly, those statements listed factors that contributed to the growth. But what it said, what those statements said was that the growth was primarily due to those factors. It was not an exhaustive list. And we cite the Markku case, which analyzed use of a similar word primarily when listing factors like this. And that case also acknowledged or read that language primarily due as acknowledging other sources. And so we don't. So there's no freestanding duty that Fruitera had to disclose the underlying payments. And these statements were not misleading because they were too general to require that additional information. And they were. Let's just say, then, if we find that those statements are actionable, do we need to send this back to the district court to assess the materiality of it? No, because the district court also separately considered materiality. And based upon the facts that are pleaded in the complaint, the court said, look, even if these improper payments occurred going back to 2007, 2008, all the way into 2018, using plaintiff's own numbers, quantitatively, at most, these payments represented between 1.6% and 2.7% of IFF and Fruitera's combined bottom line. Now, IFF itself did an internal investigation and reported in August of 2019 that based upon what it saw, that past payments at most, in the aggregate, were less than 1% of the net sales that IFF and Fruitera had combined in 2018, using that as a benchmark. So both IFF itself and the district court concluded that quantitatively, these were not even close to material looking to guidance from the SEC, but also this court and ECA v. J.P. Morgan, where it said a 5% threshold is the one to use. And then qualitatively, the district court properly considered other factors that were in the complaint and said that it just doesn't move the needle here. And on balance, it's just not material. IFF is suing Fruitera, you said, or is that right? No, IFF and Fruitera have brought a lawsuit in Israel against former executives of Fruitera. It's a breach of fiduciary duty claim in order to claw back a bonus that was paid after the merger closed. Okay, so not related to the issues here as to disclosures? That's correct. It's not a disclosure claim. It's a fiduciary duty claim, Your Honor. With that, I'm happy to answer any other questions, and we'll rest on our papers. Okay, thank you, Mr. Cooper. We'll hear next from Mr. Vagneau. Yes. Good morning, Your Honors. My name is Bruce Vagneau, and I'm here representing the individual defendants at Belize. I would like to focus on just the standing issue and whether or not plaintiffs have actually alleged sufficient facts showing bribery. I think they fail on both grounds. Let's talk about Nortel and what it says and how it applies here. Nortel did not say that if it's a merger, then it's a different rule. It said it might be, it might be enough relationship, but clearly said we're not reaching that issue. And I think if you look at the facts here and compare them to the facts in Nortel, Nortel is probably a stronger case for saying that there was a tie there and there was information. So the circumstances that plaintiffs allege in support of arguing that this is different than Nortel were in fact present in Nortel, all of them. IFF and Fruiteram coordinated their deal announcement. So did Nortel and JDS. IFF incorporated Fruiteram's historical revenue figures into its financial disclosures. JDS stated financial outlook was based on Nortel's forecast. And finally, analysts themselves tied IFF's financial outlook to Fruiteram. And the same was true in Nortel. I'm sorry, can I ask though, Nortel involved a case in which it involved the sale of a single business unit. This isn't a hundred percent acquisition. Can you, can you talk about how that may change the analysis? I don't think it does, Your Honor. The whole question, if you're going to essentially break through the blue chip stamps rule, it's not any different whether you buy a significant business unit, if that produces an impact on JDS. And clearly it did, more so than here. There's tons of evidence in Nortel that it impacted JDS and gave rise to a claim against Nortel. I don't think whether you call something a merger or purchase of an investment unit, very large purchase of an investment unit, really is the issue. It's whether or not there was enough of a direct relationship that it impacted the other company's stock price. Now, I would like to point out here, and I think one of your honors said this earlier, the few alleged statements left in this case on appeal that were made by Fruiteram were not in any way directed to IFF shareholders. The two statements made in the merger agreement were warranties. If you look at the language, they're clearly warranties made to IFF to accomplish the deal. They were not being made to IFF investors. And it goes back to the point that if there was something wrong there, IFF clearly had a case against Fruiteram. I ask you about investors who bought IFF stock after the merger. I think the class, the plaintiffs, includes that time period as well. Are they differently situated than the investors from the period between the announcement and the closing of the deal? Thanks, Your Honor. I think the real key here is the language of Blue Chip and Nortel, which is, if you didn't buy the shares of the company that you're suing, then you don't have standing to bring a claim. It's really as simple as that. And it's an effort by the courts to try to limit the boundaries of 10b-5, which have grown very wide, very broad. That seems to cover the period up through the closing of the deal. Afterwards, the company is IFF, right? Fruiteram is kind of rolled into it. Why wouldn't that then be the right defendant to sue for the post-merger investors? The statements made after the merger were statements made by IFF. The four statements that were made before that they found out about afterwards, I guess, would be the theory. The two I mentioned were warranties, referred to the website, which is basically an ethics statement that you see on all companies' websites. Those were directed at IFF investors for the eyes of Fruiteram investors and customers. And I think the bottom line is really going back to Blue Chip and Nortel. Plaintiff's lawsuit poses precisely the same problems of proof and potential for abusive securities litigation that Nortel found were sufficiently concerning to warrant a dismissal. Like the plaintiff in Nortel, plaintiffs here cannot point to their actual purchase of Fruiteram stock as proof of reliance on Fruiteram statements. And that's really a key element in these cases. I have my skepticism as to whether or not they're standing, but I am worried that you are reading too robustly Blue Chips, and I'm hoping that we can put some more nuance to this. Can you address the fact that there was actually a stock swamp and that that seems to complicate the analysis about people not purchasing, being purchasers of Fruiteram stock? Well, it was a cash and stock deal. And the stock went to the Fruiteram investors, not to the IFF investors. IFF paid for Fruiteram with stock and cash. If I have a couple of minutes, can I just comment on this bribery issue? This whole case is based on the assumption that there was illegal bribery going on. And in their amended complaint, plaintiffs pointed to three anti-bribery laws. The District Court correctly held plaintiffs don't challenge it on appeal. But those laws didn't apply. The alleged conduct in Eastern Europe. Now, plaintiffs below were aware at the time they filed their opposition brief that there had been a proceeding brought in Israel against some Fruiteram officers. They mentioned it in their brief, but they didn't seek leave to amend. And by the way, in their brief, they say that my clients were charged. My clients had never been charged with wrongdoing. They'd never been indicted. When they were first questioned, some of their assets were frozen. That's been released. This was all two years ago. I think there's nothing to that at all. But they could have asked the court for leave to amend the state bribery claims under Israeli law. They didn't do that. Then they get up on appeal. And for the first time, they talk about Ukrainian law and Russian law, really without any substance to what was the conduct that violated those laws. And that is required under this court's decisions in Gam and Dansk. There's one other point I would just like to make. I probably made it in our briefs. I would encourage the court to look at the merger agreement. And in fact, I'll give you the record sites, A-130 of the joint appendix and A-139 of the joint appendix, because it's very interesting. If you look at them, those warranties did not say that there's no bribery going on. They say not to a material amount, both of them. And so there wasn't even a warrant that there was no misconduct going on. But that's been rather overlooked. So unless you have further questions on any of this, I'd be happy to sit down, which I am. Thank you, counsel. Mr. Liebman, you've reserved three minutes for rebuttal. Yes, thank you, Your Honors. Your Honor, the NICE specialist court made clear that Nortel was not holding that the standing is limited to a purchaser. False statements made that we should induce a purchase into the into the issuing company. And so it was not to be held that these were limited to acquisitions made into the issuing company. And so here you have a scenario where false statements are being made that clearly impact IFF's share price. It is a direct relationship, is a substantial relationship. And so defendants would say is ignore NICE specialists. NICE specialists said this is not a bright line rule. And here, defendants are coming back and saying, no, there is a bright line rule. You have to be the one issuing the statement. It has to be the company that you buy the shares in. And NICE specialists actually ruling there, it was not a purchaser of the other companies that were that there was a manipulation. It's the issuing company. It was the manipulation to the market. And those are the defendants that were held to be liable in that situation. And so you would have a scenario if defendants ruling were to hold true. True. You have a scenario where you would have a SPAC that wants to accompany a target company that would inflate its prospects, inflate its financials, and an acquiring company would come in and the SPAC company would come in and buy that company. And the investor who is defrauded by those false statements would not, under the rule espoused by defendants, have a claim. And so Nortel was clear that the merger scenario would be different. The Ascendant Court was clear that a merger scenario would be different. And really, you'd be really foreclosing a significant avenue of fraud committed by defendants by foreclosing standing in the scenario. I just reversed some other statements made. Defendants said that they didn't bring any statements regarding misstatements in Israeli action. The IFF brought a claim against Yehudai saying that they made false statements in their S-4s with respect to compliance with laws. And their operations and statements in 2014 to 2016 were materially false and misleading as a result of the misstatements made in the S-4s related to the bribery. So that's clearly an admission by Frouderam itself that this was, A, illegal conduct. B, it created false and misleading statements. And importantly, that this fraud occurred even in the 2014 to 2016 statements. It's not, as the district court said, some complaint, unadjudicated complaint. Frouderam itself is making these allegations against Yehudai saying that IFF's statements in 2014 to 2016 were materially false and misleading relating to the bribery. They themselves state in the Yehudai complaint that the conduct was unlawful. We're not asking for some third party here to make some statement. The company itself, Frouderam itself, is admitting that this conduct was unlawful. Everyone's saying we haven't pled unlawful conduct here. Bribing customs officials is unlawful. I don't know what country you're in where it could be presumed that making bribes to customs officials is somehow lawful conduct. And we've pled that with significant particularity. We have allegations that that conduct continued through into the 2014, 2015 class period. And so clearly we have a claim here. The CFO of Frouderam told CW1 that this conduct continued. Frouderam itself has admitted that this conduct impacted financial statements from 2014 to 2016. And so really, then, the issue is in standing. And are we somehow going to artificially limit the scope of the securities laws when Nortel here said, wait a second, a merger is different, requires a different result. And if this court comes and says, well, and a company that's acquired – a company that's an acquiring company can't have their shareholders sue its target company for the false statements it made that causes its shares to plunge. That is a very, we think, a very dangerous precedent you're going to have, especially you see now in the SPAC boom and reverse mergers. You have loads of companies, some of them a very dubious content, a very dubious integrity, propping up their earnings, propping up their prospects. And there will be no 10B liability there because that company has been acquired. That's really what's happened here is the Frouderam investors didn't exist anymore. They have no recourse because they've been swallowed up. And the question is, where is their recourse to get some type of compensation? I hope that the court doesn't close the doors to that recourse. Thank you, Your Honors. Thank you, Counsel. We'll take the case under advisement.